EDNA HEARD BAKER, ET AL.
*vs.*
ARTHUR PETRIN, ET AL.

York. Opinion, March 23, 1953.

*Waterhouse, Spencer and Carroll,*
*N. B. & T. B. Walker,* for plaintiff.

*Lausier & Donahue,* for defendant.

SITTING: MURCHIE, C. J., MERRILL, C. J., THAXTER, FEL-
LOWS, NULTY, WILLIAMSON, JJ.

FELLOWS, J. This is an action of trespass *quare clausum,*
brought in the Superior Court for York County, to recover
statutory double damages for the destruction of a long
guard rail fence on land claimed by the plaintiffs under a
lease from the heirs of the original proprietors of "South
Point Cottage Lots" so-called, at Biddeford Pool in the city
of Biddeford, Maine. The action is brought by Edna Heard
Baker, Janet G. Edwards and Frances P. Wood against
Arthur Petrin, Wilfred Bolduc, Norbert Tremblay, Antonio
Mariello, Arthur Pratt and Antoine Martel. The defend-
ants filed plea of the general issue with brief statement
claiming dedication of the locus to the public. The case
was tried before a jury and the verdict for single damages

was $950.00, with special finding that the trespass was wilfully committed, and the damages were doubled by the justice presiding. The defendants filed general motion for new trial and also submitted a bill of exceptions. There was a view by the jury at beginning of trial.

The principal facts in this case appear to be that in the year 1882 the proprietors of certain land at Biddeford Pool in Biddeford, Maine, laid out more than 275 cottage lots, with streets and avenues between lots to provide access, and called them "South Point Cottage Lots." The lots did not border directly on the Atlantic Ocean because the strip of land, varying in width and consisting of rocks, beaches, and some level areas with beach grass and bushes, between the lot development and the ocean, was not laid out in lots as appears on the plan recorded in York Registry in 1882. Lots have been sold with reference to the plan since 1882. This method of laying out many cottage lots, where owners of the greater number of cottages cannot see the lake or ocean, is usual in Maine summer developments, in order that a lot owner may have opportunity to fully use the nearby shore or beach, with other owners, for recreational purposes.

This portion of the development, not laid out in lots and bordering directly on the ocean, was very irregular in size and shape, and extended around the easterly and southerly sides of the lot area. One part now in question was triangular in shape and approximately 180 feet wide, or deep, and was marked on the 1882 plan "Common." The evidence shows that when this was part of a farm and known as South Point Pasture, it had a barn on it, sweet grass was gathered from it, cottagers picnicked there, farmers hauled seaweed from the rocks on the shore, and the lobstermen and fishermen went to and from boats over it, as occasion required. The area was remote from the city, and only occasionally or rarely used by cottage owners and fishermen,

until the present days of automobiles with "parties and parking."

Easterly of the area comprising the lots, and westerly of the area on the ocean shore that was marked "Common," there was a 50-foot highway named "Ocean Avenue" on the plan. This highway next to the lotted area, and along the ocean side of the lots, was between the cottage lots and that part of the shore that was not laid out in lots.

In 1913 the city of Biddeford purported to lay out and accept portions of Ocean Avenue according to the plan of 1882, but the city did not fully comply with the Statutes and Charter, and evidence conflicts as to this highway's width and exact location, and exactly where it had been used and travelled. No plan of the street was filed when "laid out" by the city, and there was no complete record in the city's street record.

The plaintiffs are the owners of lots on the easterly and ocean side of the development. The plaintiffs' lots are on Ocean Avenue. Across the Avenue from the plaintiffs' lots lies the land marked "Common" on the ocean front.

On September 18, 1894, the then proprietors sold to the United States government, by indenture with the Secretary of the Treasury, certain of the lots across the Avenue from the "Common," for the establishment of a Life Saving Station with "right to erect and maintain 'Wreck Spar' on the 'Common,' so-called, be the contents what they may, with full right of egress and ingress thereto * * * and the right to pass over said streets and shore in any manner in the prosecution of said purpose, and also the right to erect such structures upon the said land as the United States may see fit." On April 3, 1896, another indenture with the Secretary of the Treasury conveyed more lots, with rights similar to those in the first indenture. Fire hydrants and electric lights have been installed at various points along the high-

way, under either the direction of water and electric companies, or by the city.

In 1930, and for some years previously, the drivers and occupants of automobiles in large numbers were using this land, across the Avenue from the plaintiffs' lots, for "parking and drinking party purposes," to the great annoyance and disturbance of the lot owners at all times of the day and night. Automobiles were used as beach houses to put on swimming garments, and clothes were hung on bushes to dry. There was much noise. There was much rubbish left. On July 25, 1930 the plaintiffs (or their predecessors in title) obtained a lease from the then proprietors, of a portion of this vacant land between Second and Fourth Streets (as and if extended to the sea) and marked "Common" on the plan of 1882, subject to "all rights and easements of the public in any way acquired over and along Ocean Avenue, so-called, and land adjacent thereto." The lease was to continue until six months' written notice be given to terminate. After receiving the lease, the plaintiffs, or their predecessors in title, apparently went into possession, as they engaged a surveyor to run the lines of Ocean Avenue, and they then in 1930 proceeded to erect a substantial automobile fence or guard rail fence along the easterly or southeasterly side of the travelled portion of the Avenue. The fence was built of strong wooden posts and heavy wire cable, and built to prevent automobiles from entering and parking on the vacant land thus situated on the ocean and marked "Common" on the 1882 plan. Openings were left near a hydrant, and near the ends of the fence, so that persons on foot had access to the sea. The fence, claimed to be owned by the plaintiffs, extended a short distance beyond the limits fixed by the lease. After the erection of this fence, the plaintiffs had no further trouble from drinking parties and automobile "parkers" during more than twenty

years from 1930, and until the trespass and destruction of the fence in 1951.

There was conflicting evidence regarding the bounds of Ocean Avenue, and whether the fence was or was not within the limits of Ocean Avenue as laid out on the plan of 1882. The presiding justice in his charge referred to and explained Revised Statutes 1944, Chapter 84, Section 102 relative to a 20-year fence as a bound. There was conflicting evidence on what had been the regular travelled portion since 1882. There was conflicting evidence on whether there was a "driveway," or usual place across the so-called "Common" to the shore where farmers and fishermen could drive to the water, and a conflict as to whether or not they did so drive. There was a conflict as to whether sand had been taken away, and whether the owners or lessees had forbidden the taking of sand but had permitted the taking of seaweed. A seventy-four year old witness, who was a daughter of one of the early proprietors and owners, testified, without objection, in relation to the "Common" on the plan, as follows: "When the land was laid out, it was restricted land, put aside by my grandfather and uncle, Thomas Cole, for the use of, to protect the people on the other side of the road. It wasn't to be built on" * * * "and it was for the purpose of the land owners down there, the lot owners." She further testified that the use of this land by the public to get seaweed and to get to boats was permissive, but the taking of sand was prohibited and prevented by her father and other owners. It was only occasionally or rarely used by the general public from 1882 to the advent of the automobile. It was used by the lot owners to go to the shore to swim, to picnic, to gather sweet grass and other recreational activities.

In August 1951, the Mayor of the city of Biddeford said to the husband of one of the plaintiffs: "That fence is coming down Monday morning." The witness answered: "That

fence is on private property and we don't want you to touch that fence," and the Mayor repeated: "That fence is coming down Monday morning."

On the morning of August 21, 1951, the defendants (who were then the Assistant Street Commissioner of Biddeford and his crew) with two trucks, commenced to tear down the fence. At this time an attorney for the plaintiffs was present and told the defendants not to move or destroy the fence. The defendants, however, demolished the fence. The estimates of value of the fence were from $1200 to $1500, with one witness who was a truck driver for the city estimating that the fence could be replaced for $200 by using the same materials. The verdict was $950 with a special finding that the trespass was committed wilfully and knowingly.

The claim of the defendants, as stated in pleadings and in briefs, is that the land where the alleged trespass was committed "was dedicated to the public partly as a public way known as Ocean Avenue and the balance of said land as the 'Common' with the right of owners of lots on plan of 'South Point Cottage Lots' to enjoy the rights as members of the public * * * and said plaintiffs are not owners within the statutory provisions relative to the recovery of double damages."

Dedication is an appropriation of land to some public use, made by the owner, and accepted for such use by or on behalf of the public. There must be a clear intent to so dedicate. Mere acquiescence by the owner in occasional and varying use by the public is not sufficient to establish dedication. See Bouvier's Law Dictionary (Eighth or Rawles Revision), citing *Campmeeting Association* v. *Andrews,* 104 Me. 342. See also the recent case of *Arnold et al.* v. *Boulay,* 147 Me. 116 and cases there cited, relative to sale of lots in reference to plan where portions of the land is apparently to be left unoccupied, and holding that there may be "an

easement by implication based upon estoppel" without dedication.

Whether there is an intent to dedicate to the general public, and the acceptance by the public are of course questions of fact. The intention must be unequivocally and satisfactorily shown. Acts and circumstances may rebut evidence that may indicate the owner's intention, such as location, value, local conditions, treating the land as his own, leasing, maintaining a fence, etc. *White* v. *Bradley,* 66 Me. 254; *Bartlett* v. *Harmon,* 107 Me. 451; *Littlefield* v. *Hubbard,* 124 Me. 299; *Piper* v. *Voorhees,* 130 Me. 305.

If there was an intention to dedicate it must be accepted in a reasonable time. *Burnham* v. *Holmes,* 137 Me. 183; *Kelley* v. *Jones,* 110 Me. 360.

The defendants say the word "Common" on the plan is evidence of the intent of the owner in 1882 to dedicate this land to the general public. That is of course true, but it is only evidence. It is certainly not conclusive as the defendants contend, under the facts and circumstances here. It might only be conclusive as an estoppel between the purchaser of a lot and the owner, under the doctrine expressed in *Arnold* v. *Boulay,* 147 Me. 116. When the plan was made and filed in 1882, the lots were on the coast in a remote place and outside built-up sections of the city. It was plainly a plan intended to encourage prospective buyers of lots for summer residences, by indicating a section not to be built upon and not to be used to interfere with the lot owners' right of access to the sea.

The word "Common" has long and often been used, and used in differing situations, to convey different meanings. It does not always mean the general public. See Bouvier's Law Dictionary, Rawles Edition "Common." What was meant, under all the circumstances in this case, was a question for jury determination. Was there an intention to in-

vite free use by the general public, or was the then intention to protect the lot buyers? Were there any acts to indicate acceptance by the public? Was the land fenced off for more than twenty years with the consent and approval of the owners? What do the sales to the government and the lease to these plaintiffs indicate? Was occasional use by the general public permissive or adverse? These and other facts may or may not determine the principal question, but all may be evidence to indicate intention.

The defendants cite in their brief the Colonial Ordinance of 1641-47 from "Ancient Charters and Laws of the Colony and Province of Massachusetts Bay," Chapter 63, which related to fishing and fowling in great ponds, bays, coves and rivers, and the stopping or hindering the passage of boats. We fail to see the application of the Ordinance under the existing circumstances, or under the points in issue in this case, nor do we see application of many cited cases relative to use and ownership of upland, shore, and flats, such as ownership of seaweed, *Hill* v. *Lord,* 48 Me. 83, or fishing privileges, *Matthews* v. *Treat,* 75 Me. 594, or filling up flats, *Marshall* v. *Walker,* 93 Me. 532, which cases were decided on common law rights of the owners of the shore, and the common law rights of the public "where the tide ebbs and flows." The charge of the justice presiding was adequate, and no exceptions were taken.

The statutory provision relative to the recovery of double damages is contained in R. S., 1944, Chap. 111, Sec. 9, and is as follows:

> "Whoever cuts down, destroys, injures, or carries away any ornamental or fruit tree, timber, wood, underwood, stones, gravel, ore, goods, or property of any kind from land not his own, without license of the owner, or injures or throws down any fences, bars, or gates, or leaves such gates open, or breaks glass in any building is liable in damages to the owner in an action of trespass. If said acts are

committed wilfully or knowingly, the defendant is liable to the owner in double damages."

There is evidence that the fence in question in this case was built and owned by the plaintiffs who claimed to hold the land under lease, and if that was found by the jury to be the fact and that there was a wilful trespass and the plaintiffs' fence was injured or thrown down, the foregoing statute applies. See *Little* v. *Palister*, 3 Me. 6.

We have examined the record with care, and viewing the evidence in the light most favorable to the plaintiffs, as the rule requires, we see no reason to grant the motion for new trial for either excessive damages, or that the verdict is against the law, the evidence, or the weight of evidence. The verdict is not "manifestly wrong." *Eaton* v. *Marcelle*, 139 Me. 256, 29 Atl. (2nd) 162; *McCully* v. *Bessey*, 142 Me. 209.

## EXCEPTIONS

During the trial the defendants took certain exceptions to the admission or exclusion of certain testimony, and also exceptions to refusal to give to the jury two requested instructions.

1. In cross examination of a surveyor this question was asked by defendants' counsel and excluded:

"Q. If the white fence in front of the Edwards property is the true line of Ocean Avenue as shown upon the plan recorded in York Registry of Deeds, Plan Book 3, Page 2, then that fence in some areas was located less than 50 feet from the white fence in front of the Edwards house, is that correct?"

The exclusion of the question was within the discretion of the justice presiding. It was argumentative. It was immaterial where Mrs. Edwards put her fence. It had very distant and doubtful relation to land across the highway

and included within the lease under which the plaintiffs claimed. *McCully* v. *Bessey*, 142 Me. 209; *Torrey* v. *Congress Square*, 145 Me. 234, 75 Atl. (2nd) 451.

2. One of the plaintiffs testified, under objection, that her father, speaking to one Hill, an heir of one of original owners and both deceased, that "he didn't care about having the wreck pole (of the Life Saving Station) stuck out in front of his house," to which Hill replied that "he would see what they could do about having it down." This statement was from one lot owner to another, and speaking of and concerning land across the street from their lots, in which each as lot owners had an interest. It was admissible within the judicial discretion of the trial judge either as construed to be "traditionary evidence," *Piper* v. *Voorhees*, 130 Me. 305, or found by the presiding justice to be a declaration of an ancient person while in possession of and on his own land. *Royal* v. *Chandler*, 83 Me. 150. It does not appear that discretion was abused. In the light of other evidence in the case the testimony was harmless. To "see" what one could do proves neither claimed authority nor power to accomplish.

3. The defendants objected to admission of the lease under which plaintiffs claimed possession, on the ground that the declaration contained no allegation regarding it. It was admissible within the court's discretion, as relevant and bearing on possession or right to possession of the land in question.

4. Defendants objected to admission of testimony of a witness to the effect that she was the sole heir of her sister. If this was an abuse of the court's discretion, the error was cured by the later introduction of the records of the Probate Court showing that fact.

5. The attorney, who had forbidden the defendants to remove the fence, testified, under objection, that one of the

defendants said in answer to his prohibition, "we have got to take this fence down or we will lose our jobs." The objection was based on the claim that the jury might be prejudiced and might believe that the city and not the defendants was financially responsible. The defendants or defense witnesses testified, however, at the trial that the defendants were in the city employ and under orders of the Street Commissioner. We fail to see that the statement was inadmissible. It was discretionary. It was spontaneous and made at the time. It was as likely to be prejudicial to the plaintiffs as to the defendants. The defendants take nothing by this exception.

6. The testimony of the witness who built the fence, as to his opinion of its value at time of removal, was objected to on the ground that he was not qualified as an expert. He was in the hardware business and had sold the various kinds of fence material, and he had built fences. He stated that when built the fence cost more than $300 and was worth, when torn down, three or four times as much. Whether a witness is qualified as an expert is a preliminary question for the justice presiding, and no exceptionable error appears here. *Hunter* v. *Totman,* 146 Me. 259, 80 Atl. (2nd) 401. In fact, the jury must have seen the fence materials when taking the view, as they were piled on the premises, and with a Maine jury there was probably no benefit from or necessity for an expert.

7. This seventh exception was taken when the court excluded certain exhibits offered by the defendants, being copies of city records or proceedings before the Mayor and City Council relative to relocation or altering of portions of Ocean Avenue in 1915. The exclusion was proper as these records did not refer to that part of Ocean Avenue on or near the land in dispute. They were not relevant and were immaterial. The justice presiding was correct in his use of discretion.

8. The defendants offered in evidence the record of location of a street light at corner of Bay Street and Ocean Avenue. This was not near the disputed area and only admissible within the court's discretion. The presiding justice was right in excluding it.

9. This exception was taken when the surveyor was asked to testify that certain courses, monuments, and other data in the city records relative to the laying out or acceptance of Ocean Avenue were in his opinion contradictory. This was within the discretion of the justice presiding, as the surveyor could well have been considered by the court as a witness qualified to give such testimony.

10. The defendants requested the following instruction to the jury at the close of the charge: "That the plaintiffs are not owners within the statutory provisions relative to the recovery of double damages." The refusal to give this instruction was proper. The jury were to find the fact of ownership of the fence, as well as the responsibility of the defendants. If the plaintiffs, in fact, owned the fence and the tearing down was wilful, the plaintiffs were entitled to double damages. R. S., 1944, Chap. 111, Sec. 9. *Benner* v. *Benner*, 119 Me. 79. The declaration alleged the fence to be the property of these plaintiffs, and it was early held that even a tenant at will can have an action for injury to his property. *Little* v. *Palister*, 3 Me. 6; *Hayward* v. *Sedgley*, 14 Me. 439, 32 Am. Jur. 219, Sec. 236, "Landlord and Tenant." See also Annotation in 12 A. L. R. (2nd) 1192; 24 Cyc. 1072. The statute gives extra damages for wilful destruction of the *owner's* property.

11. At the end of the charge to the jury, the presiding justice was also asked to give the following instruction which was refused and exception taken: "The word 'Common' written upon a block on a map of real estate indicates a public use; and when the owner of such real estate makes

conveyances of portions thereof by express reference to such map, such acts on the part of the owner, if unexplained, operate as a dedication to the public use of the block so marked." The refusal was proper. The requested instruction erroneously indicates that the word "Common" may be conclusive evidence of dedication to the public. The owner is not obliged to "explain." "Explanation" may consist of acts or existing conditions. The jury may and should take into consideration all the circumstances that may or may not indicate intention to dedicate to the general public. *White* v. *Bradley,* 66 Me. 254; *Littlefield* v. *Hubbard,* 124 Me. 299, 302; *Arnold et al.* v. *Boulay,* 147 Me. 116.

It is our opinion, therefore, that the entry must be

*Motion overruled.*

*Exceptions overruled.*